IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| HELICOPTER TRANSPORT SERVICES, INC., | ) ) ) | CV 06-3077-PA |
| Plaintiff, | ) ) | **OPINION AND ORDER** (Corrected) |
| v. | ) ) | |
| ERICKSON AIR-CRANE INCORPORATED, | ) ) ) | |
| Defendant. | ) | |
| ----------------------------- | ) | |

**PANNER, Judge.**

Plaintiff Helicopter Transport Services, Inc. ("HTS") brings this action against defendant Erickson Air-Crane, Inc. ("Erickson"), for breach of contract and violation of the antitrust laws.

HTS moves for partial summary judgment on two issues: (1) whether HTS has standing to sue as a third party beneficiary to a 1992 contract between Erickson and the Sikorsky Aircraft Division of United Technologies Corporation ("Sikorsky"), and (2) against Erickson's Ninth Affirmative Defense, which asserts that the claims of HTS are barred "by the doctrine(s) of immunity or implied preemption."

Page 1 - OPINION AND ORDER

Erickson moves for summary judgment on all claims.

The parties are familiar with the facts, and the summary judgment standard, so I do not restate those here.  Erickson's motion for summary judgment is denied.  The motion for partial summary judgment by HTS is denied as to the third party beneficiary issue but granted as to the affirmative defense of immunity or implied preemption.

## I.  Contract Claim

### A.  Whether HTS has Rights as a Third Party Beneficiary to the 1992 Contract

The parties dispute whether HTS has standing, as a third party beneficiary, to enforce certain promises Erickson allegedly made in the 1992 contract.

Erickson argues that Article XI, ¶ 4, of the contract is dispositive.  This general provision --in an article containing standard boilerplate-- is in tension with some other provisions in the contract.  Erickson also points to the declaration of Jack Erickson, who denies he intended to support the military surplus CH-54 aircraft or create an enforceable obligation to do so.  However, in construing the contract, the court must look to the parties' objective manifestations, not any unexpressed private intention.

After considering the contemporaneous written communications, both before and shortly after the contract was signed, and the contract language viewed as a whole, a jury could conclude that (1) Sikorsky and Erickson intended to create a direct obligation from Erickson to the Skycrane owners, including

persons such as HTS who subsequently acquired military surplus CH-54 Skycranes, and (2) Erickson's promise to assume this obligation was a principal reason Sikorsky agreed to make the contract.  Erickson offers a different interpretation of the relevant documents and events.  Material issues of fact preclude granting summary judgment for either side on this question.

**B.    <u>Timeliness of the Contract Claim</u>**

The parties agree that Connecticut law governs the contract claim.  The statute of limitations for contract claims--which includes claims for breach of the implied covenant of good faith and fair dealing--is six years.  Conn. Gen. Stat. § 52-576(a).  This action commenced on October 6, 2006.  Erickson contends the limitations period began to run "in the spring of 2000," when HTS allegedly learned of Erickson's policy of not selling spare parts for CH-54s.

The date HTS learned about Erickson's policy is a disputed material fact precluding summary judgment.  In addition, the present record does not show when HTS first obtained a copy of the 1992 contract, or otherwise learned of Erickson's alleged contractual obligation to supply parts.  Erickson recently represented to the court that the 1992 contract remains "confidential and has not been publicly disclosed."  Docket No. 143 (Defendant's List of Documents to Remain Under Seal).

Ordinarily, the parties to a contract know (or at least have the opportunity to learn) its terms from the outset.  That is not always true of a third party beneficiary.  HTS could not commence an action for breach of contract until HTS had notice it

possessed rights under that contract.  There also is evidence that Erickson tried to dissuade Sikorsky from revealing the contract terms.

As these are sufficient grounds for denying summary judgment on this issue, I need not consider at this time whether the facts could support applying the "continuing course of conduct" doctrine to this contract claim.  Cf. Bellmare v. Wachovia Mortg. Corp., 894 A.2d 335, 344-45  (Conn. App. 2006) (discussing that doctrine).

**C.    Obligations Assumed by Erickson Under the 1992 Contract**

Erickson acquired the rights to the "Skycrane Program," including manufacture, sale, overhaul, repair, spare parts, technical data and tooling.[1]  The contract expressly defines "Skycrane" to include both the S-64E/F and CH-54A/B models. Erickson assented "to accept the duties, obligations and liabilities of such program . . . ."

Article I, ¶ 3, states: "[A]s the U.S. government owns certain CH-54 aircraft, the provisions of this agreement shall, to the extent specified herein, also apply to Buyer as the successor to Seller to such CH-54 program, with respect to such CH-54 aircraft, whether in the possession of the U.S. Government or subsequent purchasers of these aircraft as surplus military aircraft."

Article II, § 3(b) states that, within 120 days, Sikorsky was to notify a list of people, including all "operators . . .

---

[1]  Erickson did agree that Sikorsky would continue to manufacture the main and tail rotor blades, under a license from Erickson.

for the Skycrane":

> . . . (2) that Buyer has obligated itself to support
> the Skycrane aircraft as required by 14 C.F.R. 21 and
> 14 C.F.R. 29; (3) that Buyer shall thereafter be,
> pursuant to this agreement, the direct source for re-
> supply of parts, components, and accessories for the
> Skycrane aircraft and; (4) that Buyer shall commit
> itself to providing support and parts for the other
> owners and commercial operators of the aircraft
> certified under the type certificates listed in Article
> IV-4 below; (provided, however, that such obligations
> of Buyer are subject to Buyer's transfer or abandonment
> thereof as permitted by law).

Erickson's contention that it undertook no obligations to
"subsequent purchasers of [the CH-54] as surplus military
aircraft" is refuted by the express language of the agreement. I
am unpersuaded by Erickson's argument that the language in
Article I, ¶ 3, merely confers on Erickson the benefits of the
military contractor defense in the event of a future products
liability claim. If that were all the paragraph were intended to
accomplish, it would have been worded quite differently. The
preface to Article I--"Buyer expressly acknowledges that . . . ."
rather than "Seller expressly represents that"--also weighs
against Erickson's interpretation. Sikorsky had personal
knowledge of the historical facts recited in that Article.
Erickson did not. The language employed, in that context, makes
sense only if the Buyer were assuming a duty.

Reading Article I, ¶ 3, as expressly clarifying that the
contract covers both military and surplus CH-54s is consistent
with the remainder of the agreement, which draws no distinction
between military and ex-military helicopters. It also is

consistent with the letters exchanged between the parties, in
which Erickson strongly emphasized the need, and its intent, to
support any future military surplus CH-54s, and specifically
proposed to acquire from Sikorsky "the rights to provide all
overhaul and repair for the CH-54A and for the CH-54B."

Finally, it is consistent with Article II, § 3(b), by which
Sikorsky was to notify all "operators . . . for the Skycrane"
that Erickson was now "the direct source for re-supply of parts,
components, and accessories for the Skycrane aircraft . . . ."
Again, no distinction is drawn between S-64 and CH-54 operators.
I can see no plausible reason why the contracting parties would
have agreed to have Sikorsky send such a notice, unless they
believed this accurately reflected the terms of their contract.

Article II, § 3(b)(2), states "(2) that Buyer has obligated
itself to support the Skycrane aircraft as required by 14 C.F.R.
21 and 14 C.F.R. 29 . . . ."  Erickson argues that this provision
establishes the outer limits of Erickson's duties to Skycrane
operators, and that Erickson need do no more than comply with
those FAA regulations.

In Erickson's submissions to the court, when citing
§ 3(b)(2), Erickson invariably adds limiting words such as
"solely" or "only to the extent."  Those qualifying words are not
in the contract.  If the intent of the parties was to limit
Erickson's duty in that manner, Erickson would have included the
additional words.  It also is difficult to reconcile Erickson's
reading with the words that follow:  "Buyer shall thereafter be,
pursuant to this agreement, the direct source for re-supply of

parts, components and accessories for the Skycrane aircraft . . .
."  The contract clearly states that the term "Skycrane"
encompasses both the S-64 and CH-54.

The acknowledgment that Erickson would comply with 14
C.F.R., Parts 21 and 29, does not establish a ceiling on
Erickson's contractual obligations, but a floor.[2]  An express
assumption of that duty, by Erickson, was necessary to satisfy
the FAA and authorize transfer to Erickson of the Type
Certificates for the S-64.  No comparable requirement existed for
a Restricted Category Type aircraft, such as the military surplus
CH-54, so there was no need for the contract to cite such a
regulation nor anything to cite.

Article II, § 3(b), states "(4) that Buyer shall commit
itself to providing support and parts for the other owners and
commercial operators of the aircraft certified under the type
certificates listed in Article IV-4 below; (provided, however,
that such obligations of Buyer are subject to Buyer's transfer or
abandonment thereof as permitted by law)."  The Type Certificates
listed in Article IV-4 cover only the S-64.

Erickson argues that this language has the effect of
limiting Erickson's contractual obligations to only those
aircraft specifically covered by the listed Type Certificates,

---

[2]  In a lease agreement, a tenant may expressly promise not
to permit the premises to be used for violation of narcotics
laws.  It is unlikely such promise would be deemed to implicitly
negate the tenant's duty to comply with other applicable laws, or
to preclude the landlord from evicting the tenant for operating a
brothel in the apartment.  Similarly, Erickson's express
acknowledgment of its obligation to comply with certain federal
regulations does not implicitly negate other duties created by
the contract.

*i.e.,* the S-64.  The short answer is that, "at the time of the
Erickson-Sikorsky agreement in 1992, there was, unlike with the
S-64 civilian use aircraft, no CH-54 type certificate for
Erickson to acquire."  Erickson's Reply in Support of Motion to
Dismiss, p. 6.  Few military surplus CH-54s then existed.
Contemporaneous correspondence indicates that Sikorsky and
Erickson both contemplated the number of military surplus CH-54s
would increase, and sought, through the 1992 contract, to provide
for the future support of ex-military CH-54s.

Ǔ    The contract does not expressly confine Erickson's rights
and duties to only those conferred or imposed by the transferred
Type Certificates.  Even if FAA regulations do not require
Erickson to support aircraft other than those for which Erickson
holds a Type Certificate, neither do those regulations prohibit
Erickson from voluntarily assuming such a duty by contract, as
Erickson did in the 1992 contract.

Ǔ    Erickson also relies upon the provision that "such
obligations of Buyer are subject to Buyer's transfer or
abandonment thereof as permitted by law."  To the extent the "as
permitted by law language" refers to duties imposed on a
manufacturer by the FAA regulations, such duties are not at issue
here.[3]

---

[3]  HTS argues that when a program is abandoned, "the FAA
takes charge of the data for the aircraft and makes it available
to other operators for the continued operational safety of the
aircraft," yet Erickson allegedly has not provided to the FAA a
notice of abandonment or the required technical data.  HTS Reply,
p. 6.

With regard to any contractual duties that Erickson sought
to abandon, Connecticut law, like Oregon, holds that every
contract contains an implied covenant of good faith and fair
dealing.  See Renaissance Mgt. Co. v. Connecticut Hous. Fin.
Auth., 915 A.2d 290, 297-98 (Conn. 2007).[4]

Whether Erickson exercised its discretion in good faith is a
disputed question of material fact.  A jury could find (1) that
Erickson never intended to honor its contractual obligation to
support the CH-54, (2) that Erickson made contrary
representations to induce Sikorsky to sign the contract, and (3)
that Erickson made no effort to support the CH-54 after acquiring
the Skycrane program, as opposed to withdrawing support later due
to subsequent events or for legitimate business reasons.  The
record also contains evidence from which a jury might conclude
that Erickson initially withheld support for the CH-54 in an
attempt to coerce CH-54 owners to purchase Erickson's expensive
S-64 conversion service and, later, for other improper reasons.
Erickson disputes this.  A jury will decide which version is
correct.

---

[4]  A Connecticut trial court has expressed the view that a
third party beneficiary may not enforce the implied covenant of
good fair and fair dealing.  See Beck v. New Samaritan Family
Housing of Waterbury, Inc., 2005 WL 1670810 (Conn. Super. 2005)
(but acknowledging no appellate court in Connecticut has ruled on
this question).  It seems peculiar to hold that a contracting
party must act in good faith regarding the other contracting
party, yet may act in bad faith toward a third party beneficiary
to whom the parties intended to create a direct obligation,
depriving that person of the benefits the contract was to confer.
I do not believe the Connecticut Supreme Court would adopt such a
rule, and respectfully decline to follow Beck on this point.  See
Fiorito Bros., Inc. v. Fruehauf Corp., 747 F.2d 1309, 1314 (9th
Cir. 1984) (federal court must attempt to predict how state's
highest court would decide question of state law).

**D.   <u>Injury</u>**

Whether HTS was injured by Erickson's actions is a disputed factual question, Mr. Womack's testimony notwithstanding. Summary judgment on this ground is denied.

## II.  <u>Antitrust Claims</u>

**A.   <u>Timeliness of Antitrust Claims</u>**

Erickson is not entitled to summary judgment on this basis. When HTS learned of certain facts is disputed.  In addition, so long as HTS could still readily obtain the necessary parts through the surplus market, HTS was unable to state a viable claim for monopolization or attempted monopolization, there being no basis to plead injury or imminent threat to competition.  Such a claim would have been too speculative.  The "continuing violation" doctrine may also apply here, in view of overt acts and injuries allegedly occurring within the four years prior to commencement of this action.  <u>Cf.</u> <u>LaSalvia v. United Dairymen of Arizona</u>, 804 F.2d 1113, 1117 (9th Cir. 1986).  The cases Erickson relies upon are factually distinguishable.

**B.   <u>FAA Regulations and Antitrust Laws</u>**

HTS moves for partial summary judgment against Erickson's Ninth Affirmative Defense, which asserts that the claims of HTS are barred "by the doctrine(s) of immunity or implied preemption."  That motion is granted.

Erickson points to no applicable FAA regulation or statute that expressly preempts the antitrust laws.  Nor, generally

speaking, do the applicable regulations[5] occupy the field to such
an extent as to leave no room for enforcement of antitrust laws.
Cf. Credit Suisse Securities (USA) LLC v. Billing, ___ U.S. ___,
127 S. Ct. 2383, 2387, 2392 (2007) (implicit preemption applies
only if there is a "plain repugnancy" between antitrust claims
and federal securities law, also characterized as whether the two
are "clearly incompatible"); Otter Tail Power Co. v. United
States, 410 U.S. 366, 372-75 (1973) ("courts must be hesitant to
conclude that Congress intended to override the fundamental
national policies embodied in the antitrust laws"); Silver v. New
York Stock Exchange, 373 U.S. 341 (1963).

If a particular regulation creates an irreconcilable
conflict with the antitrust laws, the court must determine which
requirement prevails.  The parties agree that if an FAA safety
regulation prevents Erickson from taking certain actions--as
opposed to just making such actions a little more burdensome--
then the antitrust laws will not hold Erickson liable for
complying with that regulation.[6]  Since compliance would be a

---

[5]    The FAA regulations at issue here concern aircraft parts.
I have no occasion to consider the applicability of antitrust law
to any other aviation issue.  Cf. Hughes Tool Co. v. Trans World
Airlines, Inc., 409 U.S. 363, 387 ("Federal Aviation Act does not
completely displace the antitrust laws" but the particular claims
in that action were preempted).

[6]    In Harrison Aire, Inc. v. Aerostar Int'l, Inc., 316 F.
Supp. 2d 186 (E.D. Pa. 2004), the court framed the inquiry as
whether the FAA had "specifically considered the potential
alleged anticompetitive consequences" of the agency's action.
Id. at 210.  The defendant was arguing that immunity from
antitrust laws was conferred by the FAA's approval of the
manufacturer's Instructions for Continued Airworthiness, which
included language implying customers must use fabric purchased
from a particular source.  The present case does not concern FAA
approval of a user manual.

legitimate business reason for the conduct, resort to the doctrine of implied preemption is unnecessary.  Whether this case presents such a scenario is discussed elsewhere.

Erickson also asserts a defense of "immunity."  The term "antitrust immunity" has been loosely employed in several contexts, including as a synonym for express or implied preemption by another federal law, see United States v. National Ass'n of Securities Dealers, Inc., 422 U.S. 694, 703-05 (1975), or when referring to the Noerr-Pennington doctrine, see B E & K Construction Co. v. National Labor Relations Board, 536 U.S. 516 (2002), or to "state-action immunity from antitrust," Federal Trade Commission v. Ticor Title Ins. Co., 504 U.S. 621, 625 (1992).  Erickson appears to use the term in the implied preemption context.  This argument has already been addressed.

## C.   Monopoly or Dangerous Probability of Monopoly

Erickson asserts that, as a matter of law, it has neither a monopoly nor a dangerous probability of acquiring a monopoly in either the CH-54 parts market or the heavy helicopter market. The record, viewed in the light most favorable to HTS, does not permit granting summary judgment for Erickson on this ground.

A relevant market, for antitrust purposes, can consist of replacement parts for a particular product.  See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451 (1992). There is evidence that Erickson monopolizes the market for CH-54 and S-64 parts--controlling nearly all production and sales, along with the inventory, tooling, and drawings.  A jury could find that Erickson has sought to leverage its control of the

parts market to thwart competition in the heavy helicopter services market, and for other improper purposes.

While it may seem peculiar to say that Erickson monopolizes a market in which it denies participating, a jury could find that Erickson dominates the market for CH-54 parts.  Restricting output of a product is a tactic used by monopolists.  The unusual feature in this case is that the alleged objective is not to profit directly, by increasing the price Erickson receives for helicopter parts sold to CH-54 operators, but to profit indirectly by using the restricted output of parts, and control over the inventory, tooling, and drawings, to leverage Erickson's monopoly into a second market.

According to the evidence proffered by HTS, no product can substitute for the particular parts at issue, except S-64 parts, which HTS contends are one and the same, and also are controlled by Erickson.

A jury could find that heavy helicopters are a distinct market,[7] because lighter helicopters are incapable of performing many tasks for which heavy helicopters are utilized, and it may not be cost-effective to use a heavy helicopter for tasks that can satisfactorily be performed by lighter helicopters. Erickson contends lighter helicopters actually do compete with heavy helicopters, and are part of the same relevant product

---

[7]  HTS has been less-than-consistent in defining whether the relevant market includes only helicopters with a lift capacity of at least 25,000 pounds, or if 20,000 pound capacity helicopters also are included, and whether the relevant geographic market is just the United States or the entire world.  At some time, preferably before we instruct the jury, HTS must settle on a proposed market definition.

market, but that is a factual dispute which the jury must resolve.

There is evidence from which a jury could find the presence of significant barriers to entry for any prospective competitor, compared to the barriers Erickson faced, and a dangerous probability of success in monopolizing the relevant market.

Some helicopter parts can satisfactorily be reverse-engineered and fabricated. If a particular aircraft model was manufactured in sufficiently large quantities, this can be a profitable undertaking, and can foster competition and result in lower prices for buyers of aftermarket parts. See Lisa Wright, *The Puzzling Parts Aftermarket*, AIR BEAT MAGAZINE (July-Aug. 2004). However, there also is evidence that reverse-engineering and fabricating certain helicopter parts can be very difficult and costly, can take years to accomplish properly,[8] and can be impractical for the CH-54. A very limited number of CH-54 helicopters exist, and a wide range of parts are needed to support a CH-54 helicopter. The potential customer base may be too small to economically reverse-engineer and fabricate certain parts. A jury could find that Erickson obtained the tooling, inventory, and design data for the CH-54 parts for a small fraction of what it would cost a competitor to replicate, if that were even feasible to do.

---

[8] The FAA has cautioned that "[t]he reverse engineering process uses techniques that vary widely and produce diverse results[,]" and that "reverse engineering a part will not normally produce a design that is identical to a type-certificated part." FAA Order 8110.42B, Parts Manufacturer Approval Procedures (Sept. 9, 2005), §§ 2-6(c), 3-8(a).

Turning to the helicopter market, Erickson points to the existence of a few Boeing 234 UT Chinook helicopters, but none have been manufactured in years.  The Russian Mil MI-26 helicopter operates overseas, but reportedly cannot be used within the United States.  The cost of establishing a new heavy helicopter program likely would be prohibitive, given the relatively small production volume required to serve the civilian market.  Such programs typically flow from military procurement.

 A jury also could conclude that the additional profits gained through Erickson's alleged conduct would enable Erickson to recoup any short-term losses sustained from restricting output and foregoing the sale of parts, data, and other items to CH-54 operators.

**D.    Legitimate Business Reasons**

Whether Erickson acted for legitimate business reasons, or for predatory purposes prohibited by the antitrust laws, is a disputed factual question.

Over the years, Erickson has offered various explanations for its refusal to sell parts to CH-54 operators.  Erickson now says it did not want to be in the business of selling CH-54 parts, yet Erickson signed a contract that obligated Erickson to support the Skycranes, including the CH-54.  There is evidence that Erickson's representation that it wished to provide future support for military surplus CH-54s was a key selling point in Erickson's campaign to induce Sikorsky to make that contract. HTS also has offered evidence that the helicopter parts CH-54 operators sought to obtain from Erickson often were the very same

parts Erickson was already selling to S-64 operators and, in some instances, to the very same customer (who owned both models).

Erickson allegedly forbid third parties to make and sell parts to CH-54 operators, though those third party transactions would not have required Erickson to "be in the business of selling CH-54 parts." Similarly, Erickson admits it refused to provide CH-54 operators with data that would permit those operators to make the parts themselves, even though Erickson had no use for that data and the CH-54 operators offered to pay Erickson to obtain the data.

A few operators own both S-64 and CH-54 aircraft. There is evidence Erickson forbid those operators to install, in their CH-54s, parts they purchased from Erickson, though the parts allegedly were suitable for use on the CH-54. Erickson also allegedly forbid S-64 operators to transfer parts to CH-54 operators. There is evidence Erickson invested considerable effort and expense in policing the foregoing prohibitions.

Erickson contends it was concerned about potential products liability if it sold parts to CH-54 operators. Erickson acknowledges it carries products liability insurance in connection with the parts it sells to S-64 operators, and that this expense is factored into the price Erickson charges for the parts. Erickson also concedes it never inquired about the cost or availability of products liability insurance for sales of parts to CH-54 operators, assuming, *arguendo*, that such sales are not already covered by Erickson's existing products liability insurance. HTS reportedly proposed an indemnification agreement

to address any potential liability, but to no avail.  Whether potential products liability was the true reason Erickson refused to sell parts to CH-54 operators is a disputed question of fact to be determined by the jury.

Another reason Erickson gives for not selling parts to CH-54 operators is that Erickson does not know what modifications CH-54 operators may have made to their aircraft.  HTS responds that Erickson has no more knowledge regarding S-64 aircraft in the hands of third parties, yet Erickson sells S-64 parts to them.  Erickson insists it does have more knowledge.  Whether Erickson actually does, and whether that matters or is a pretext for not selling to CH-54 operators, is a factual issue for the jury.

Erickson also argues that FAA regulations prohibit Erickson from selling parts intended for use on a CH-54.  It appears that Erickson first asserted this argument recently.  If so, it is unlikely such concerns could have motivated Erickson's allegedly longstanding refusal to sell those parts.  At oral argument, Erickson conceded it has never asked the FAA whether such sales would violate FAA regulations, nor sought permission from the FAA to sell parts to CH-54 operators.

Erickson argues that extensive design testing is required to obtain a Parts Manufacturer Approval ("PMA").  However, 14 U.S.C. § 21.203(c)(4) expressly waives this requirement if "the design of the part is identical to the design of a part that is covered under a type certificate."  Erickson acknowledges it has obtained hundreds of PMAs from the FAA for S-64 parts.  HTS contends the CH-54 utilizes the identical parts, and Erickson

could, with little additional effort, have obtained approval to manufacture a part for use on both the CH-54 and S-64.  Viewing the facts in the light most favorable to HTS, a jury could conclude that Erickson was readily able to obtain permission from the FAA to provide parts to HTS and other CH-54 operators, if such permission was even necessary, but chose not to for anti-competitive reasons.

Whether permission from the FAA actually was necessary is another matter.  By its own terms, 14 C.F.R. § 21.303 governs only the (1) production, (2) of modification or replacement parts, (3) for sale, (4) with the specific intent (or with the knowledge it was substantially certain) the parts would be installed on a type certificated product.  Id.; In the Matter of Pacific Sky Supply, Inc., 1993 WL 833101 (FAA Order No. 93-19) (June 9, 1993).

Section 21.303 has never prohibited Erickson from selling, to HTS or to other CH-54 operators, parts originally manufactured by Sikorsky and transferred to Erickson following the 1992 sale of the Skycrane program.  See Pacific Sky Supply at *3 ("If the part is not produced with [the prohibited] intent, but subsequently is installed in a type-certificated product, the producer is not subject to FAR 21.303(a).")  Erickson's Restricted Category Type Certificate argument notwithstanding, Sikorsky was the aircraft manufacturer and possessed any necessary FAA approvals at the time it manufactured those parts. Section 21.303 is concerned with the manufacturer's intent at the time of production.  Nevertheless, Erickson refused to sell parts

to CH-54 operators.  Notably, Erickson did not claim it needed these parts for its own use, and could not spare them.  On the contrary, Erickson allegedly sold the very same parts to S-64 operators, yet categorically refused to provide parts to CH-54 operators.

With respect to sales of CH-64 parts, Erickson need not turn a blind eye to an obvious diversion, and risk being penalized by the FAA, but neither do the regulations require Erickson to go to extreme lengths to ensure that CH-54 operators do not use parts that Erickson had produced and sold with the understanding they were to be installed on an S-64.  See Pacific Sky Supply, 1993 WL 833101.  If Erickson engaged in such conduct--and the record contains some evidence of that--then Erickson did so voluntarily and not under legal compulsion.

Erickson allegedly has prohibited third parties from selling parts to HTS or fabricating parts for HTS.  Erickson has not identified any provision in § 21.303 that requires Erickson to take such actions.  Nor does § 21.303 prohibit Erickson from licensing part drawings and other technical data to CH-54 operators, so they may produce parts for their own use.  See § 21.303(b).  See also FAA Order 8110.42B, § 2-3 (establishing identicality by showing evidence of licensing agreement).  Indeed, it is difficult to see how aviation safety--the objective of the applicable FAA regulations-- could possibly be furthered by withholding the very data needed to produce reliable

replacement parts for the CH-54.[9]

In summary, a jury could find that Erickson voluntarily chose this course of conduct, and its actions are not attributable to § 21.303.

**E.    Unilateral Refusal to Deal and Trinko**

The present action is not, as Erickson seeks to portray it, a "refusal-to-deal case, pure and simple," between a single buyer and seller, or between a manufacturer and the distributors it chooses to employ.  Rather, Erickson allegedly is abusing a monopoly in the CH-54 parts market to thwart competition in, and attempt to monopolize, the heavy helicopter services market, and for other improper purposes.

Defendant contends Verizon Communications Inc. v. Law Offices of Curtis Trinko LLP, 540 U.S. 398 (2004), effected a sea change in antitrust law.  It did not.  Trinko merely recited and applied the same antitrust standards the Supreme Court has articulated for years.  Moreover, the facts in Trinko suggest the Federal Communications Commission was already addressing any problem.  An attorney, seeking to reap a windfall from a consent decree he had played no role in procuring, brought a class action

_____

[9]  The prohibitions of § 21.303 do not apply to parts produced under a type certificate, or by an owner or operator for maintaining or altering his own product.  § 21.303(b)(1) and (b)(2).  HTS holds the type certificate for its own CH-54s.  The present briefing is insufficient to determine whether § 21.303(b)(1) and (2) permit HTS to contract with Erickson to produce parts for HTS, or whether the operator must actually make the parts itself.

HTS also contends that Erickson may sell parts to HTS on an "as-is" basis.  Again, the current briefing is not sufficiently developed to decide that question.

lawsuit.  The courts properly made short work of his claim.

The present action bears no resemblance to _Trinko_.  Viewed in the light most favorable to HTS, the facts here--including Erickson's alleged refusal to sell parts even at full retail price, or to sell parts manufacturing data it admittedly had no use for, and Erickson's alleged attempts to coerce CH-54 owners to purchase Erickson's costly S-64 conversion service before Erickson would let them buy parts--more closely resemble the situation in cases such as _Aspen Skiing Co. v. Aspen Highlands Skiing Corp._, 472 U.S. 585 (1985) (refusal to sell lift tickets even at full retail price), and _Otter Tail Power Co._, 410 U.S. 366 (refusal to sell electrical power wholesale to municipalities, or to permit transmission lines to be used to deliver power to those municipalities, in order to coerce municipalities into granting Otter Tail the right to operate the retail electrical distribution network in those towns).

That Erickson and HTS had no prior course of dealing is immaterial.  The Supreme Court has never held that termination of a preexisting course of dealing is a necessary element of an antitrust claim.[10]  It was merely one of several facts in _Aspen Skiing_ that supported a finding that the refusal to deal was intended to exclude competition rather than to advance a legitimate business interest.

---

[10]  Erickson cites _Covad Communications Co. v. BellSouth Corp._, 374 F.3d 1044, 1049 (11th Cir. 2004), for the proposition that "_Trinko_ now effectively makes the unilateral termination of a voluntary course of dealing a requirement for a valid refusal-to-deal claim under _Aspen_."  _Trinko_ said no such thing.  I respectfully decline to adopt the view of the Eleventh Circuit on that point.

**F.    Concerted Action - Section 1 Claims**

Section 1 of the Sherman Act does not reach claims that are "wholly unilateral." Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984).

Erickson argues that Plaintiff's Section 1 claims fail, as a matter of law, because the Complaint alleges that Erickson either induced or coerced third parties not to sell parts to HTS, and that Erickson entered into contracts with third parties which prohibit those third parties from selling to HTS.

Erickson reasons that "concerted action requires proof that multiple entities acted *willfully together*; showing that one entity has coerced or compelled others to act does not establish a 'contract, combination, or conspiracy' under Section 1." Erickson's Summary Judgment Memo., p. 30 (emphasis in original). That a third party "involuntarily complies to avoid termination of his product source" is not enough.  Id.

Even assuming Erickson's interpretation of the law is correct, the allegation in the Complaint that a third party's actions were "induced" or that Erickson entered into contracts with third parties does not negate the possibility of voluntary concerted action.  Depending upon the evidence at trial, the jury may need to decide whether the facts of this case fall on the "coerced or compelled" or "involuntarily complies" side of the line, or whether there was "a unity of purpose or a common design and understanding . . . ." American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946).  The Section 1 claims also remain available as an alternative theory, if the evidence at

trial differs from what HTS presently expects the evidence to show.

## Conclusion

Defendant's motion (# 57) for summary judgment is denied. Plaintiff's motion (# 53) for partial summary judgment is denied as to the third party beneficiary issue but granted as to the affirmative defense of "immunity" or implied preemption.

IT IS SO ORDERED.

DATED this 14th day of January, 2008.


/s/ Owen M. Panner

_____
OWEN M. PANNER
UNITED STATES DISTRICT JUDGE