```
                    IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF OREGON

HELICOPTER TRANSPORT          )     CV 06-3077-PA
SERVICES, INC.,               )
                              )
              Plaintiff,      )     OPINION AND ORDER
                              )
     v.                       )
                              )
ERICKSON AIR-CRANE            )
INCORPORATED,                 )
                              )
              Defendant.      )
------------------------------)
```

**PANNER, Judge.**

    Plaintiff Helicopter Transport Services, Inc. ("HTS") brings this action against defendant Erickson Air-Crane, Inc. ("EAC"). EAC has moved for reconsideration of a pretrial ruling on a motion in limine. After considering the submissions from the parties, and the entire record, I conclude that partial summary judgment should be granted for HTS on the issue of whether HTS has standing, as a third party beneficiary, to enforce certain provisions of a 1992 contract between EAC and the Sikorsky Aircraft Division of United Technologies Corporation ("Sikorsky").

Page 1 - OPINION AND ORDER

## Prior Rulings

My previous opinion concluded, among other things, that:

**  Contemporaneous correspondence indicates Sikorsky and EAC both contemplated the number of military surplus CH-54s would increase, and sought, through the 1992 contract, to provide for the future support of ex-military CH-54s.

**  The contract expressly defined "Skycrane" to include both the S-64E/F and CH-54A/B models.

**   The contract required Sikorsky to notify all Skycrane operators (and others) that EAC "shall thereafter be, pursuant to this agreement, the direct source for re-supply of parts, components, and accessories for the Skycrane aircraft . . . ."

**   EAC assented "to accept the duties, obligations and liabilities of [the Skycrane] program . . . ."

**   EAC's contention that it undertook no obligations to "subsequent purchasers of [the CH-54] as surplus military aircraft" is refuted by the express language of the agreement.

**   The acknowledgment that EAC would comply with 14 C.F.R., Parts 21 and 29, does not establish a ceiling on EAC's contractual obligations, but a floor.

**   The contract does not expressly confine EAC's rights and duties to only those conferred or imposed by the transferred Type Certificates.  Even if FAA regulations do not require EAC to support aircraft other than those for which EAC holds a Type Certificate, neither do those regulations prohibit EAC from voluntarily assuming such a duty by contract, as EAC did in the 1992 contract.

Page 2 - OPINION AND ORDER

I further concluded that:

> After considering the contemporaneous written communications, both before and shortly after the contract was signed, and the contract language viewed as a whole, a jury could conclude that (1) Sikorsky and [EAC] intended to create a direct obligation from [EAC] to the Skycrane owners, including persons such as HTS who subsequently acquired military surplus CH-54 Skycranes, and (2) [EAC's] promise to assume this obligation was a principal reason Sikorsky agreed to make the contract. [EAC] offers a different interpretation of the relevant documents and events. Material issues of fact preclude granting summary judgment for either side on this question.

HTS filed pretrial motions in limine to exclude certain testimony. Following the first pretrial conference, I entered an order stating, in relevant part:

> Whether the parties intended to create a direct obligation to a third party is no different from any other question of contract interpretation. The court will not permit a witness to offer his or her subjective interpretation of the 1992 contract, or what the witness now claims he intended by including (or omitting) certain language in the contract, or testimony about alleged oral statements during the negotiations. Those events occurred over 15 years ago. Many participants will not be at trial, Plaintiff was not in attendance at the negotiations, and Sikorsky is not a party to this action. The contract, and other contemporaneous writings that satisfy the evidence rules, may be offered as evidence of objectively manifested intent.

EAC then moved for reconsideration of that ruling. In evaluating that motion, the court has benefitted from a more fully developed record than was available when the court

Page 3 - OPINION AND ORDER

considered the original summary judgment motions, including additional deposition excerpts and exhibits. The parties also have filed detailed witness statements, setting forth the testimony each party expects to adduce on direct examination.

## Legal Standard

The parties agree the contract claim is governed by Connecticut law. Under the law of that state,

> A contract is to be construed according to what may be assumed to have been the understanding and intention of the parties. That intention is to be determined from the language used, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used.

Ginsberg v. Mascia, 149 Conn. 502, 505-06, 182 A.2d 4, 5-6 (1962) (internal citations omitted).

The ultimate test to be applied in determining whether a person has a right of action as a third party beneficiary is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party beneficiary. Dow & Condon, Inc. v. Brookfield Development Corp., 266 Conn. 572, 580, 833 A.2d 908, 914 (2003).

## Discussion

At deposition, Jack Erickson testified as follows:

> Q: What's your understanding of what -- the language in section 3(b)(3) of Article II of the agreement. When it says the buyer shall thereafter be the direct source of resupply of parts, components, and accessories for the Skycrane aircraft, what was that intended to mean?

>   A:   Skycranes for the military.
>
>               * * * *
>
>   Q:   And was it your understanding that based on
>        this paragraph, Erickson was undertaking an
>        obligation to supply the military with parts
>        -- parts, components, and accessories?
>
>   A:   Yes.

Jack Erickson Depo., p. 69.

This testimony acknowledges that, in the 1992 contract, EAC did not merely acquire the right to sell products. Erickson recognized that EAC also had undertaken an affirmative obligation to supply parts, components, and accessories, and that this obligation was owed to someone not a party to the contract, *i.e.,* a direct obligation to a third party.

This deposition excerpt also acknowledges that EAC's obligation to supply parts was not premised solely upon FAA regulations or the transferred type certificates.[1]

Finally, this testimony confirms that EAC assumed an obligation to supply parts for the CH-54, and not just for the S-64 as EAC's lawyers have argued during this litigation.

Each of the foregoing points is consistent with the court's previously stated interpretation of the 1992 contract.

The remaining question is whether the contractual obligation to supply parts for the CH-54 was confined to aircraft in the possession of the military, or if it applied to all CH-54s. Put

---

[1] See also Ex. 8 (letter from Jack Erickson to Sikorsky, dated September 25, 1991) ("Erickson acknowledges it's obligation to the FAA as a type certificate holder *and to provide parts and overhaul services to Skycrane operators)* (emphasis added).

Page 5 - OPINION AND ORDER

another way, was the military the only third party to whom EAC assumed an obligation, or did that obligation extend to subsequent purchasers of these aircraft after surplus?

I find nothing in the contract that indicates EAC's duty to support the CH-54 terminated once the aircraft was no longer in the possession of the military. On the contrary, Article I, ¶ 3, states: "[A]s the U.S. government owns certain CH-54 aircraft, the provisions of this agreement shall, to the extent specified herein, also apply to Buyer as the successor to Seller to such CH-54 program, with respect to such CH-54 aircraft, whether in the possession of the U.S. Government or subsequent purchasers of these aircraft as surplus military aircraft."

The conclusion that EAC's duty to support the CH-54 continued after the aircraft was "surplused" is consistent with the contemporaneous documents. In the very letter in which EAC proposed to acquire the Skycrane program, Jack Erickson stated:

> Our intention is to continue operation of the Skycrane for many more years and to play a key role in the support of those CH-54s which may be used in the future, either within the Guard or after surplus occurs. We are, therefore, particularly concerned about the base of future support for both the Skycrane and the CH-54, and we would like to discuss a constructive step toward assuring that future support.
>
> Erickson is interested in negotiating with Sikorsky, for acquisition by Erickson, of the Type Certificate to the S-64 and for the rights to provide all overhaul and repair for the CH-54A and for the CH-54B. We believe that this would be in the best interests of Sikorsky for both business and management reasons.

> Sikorsky has a basic obligation and responsibility to support the Skycranes and the CH-54's as long as they are operated. This support results in a serious diversion of the attention of key managers in Sikorsky and requires substantial administrative effort. The support is intermittent, resulting in inefficiencies, and when required, it is usually of a crisis nature because of the unavailability of parts or because of an unusual operating problem. These problems may be expected to multiply significantly when the CH-54 reaches surplus status. We believe that this is the time for Sikorsky to take steps to avoid this potential crisis.
>
> * * * *
>
> [Sikorsky] must protect its reputation with past products. . . . We believe that the transfer of liability for such programs, from Sikorsky to Erickson, would be in the best interest of Sikorsky . . . .

Ex. 6 (Letter to Sikorsky, dated May 11, 1990).

The stated rationale for the transaction was that the CH-54 would go into surplus soon and require extensive support. Sikorsky did not need the headache of supporting aging military surplus CH-54s, yet Sikorsky had a reputation to protect. EAC proposed to solve that problem by assuming "liability for such programs." See also Jack Erickson Depo., pp. 36-37, 43.

The parties exchanged drafts of a contract, and letters commenting thereupon. EAC insisted the sale include both the civilian S-64 and military CH-54 models. EAC agreed the contract should acknowledge EAC's "obligation to the FAA as a type certificate holder and to provide parts and overhaul services to Skycrane operators." Ex. 8.

Page 7 - OPINION AND ORDER

In a letter to EAC dated December 10, 1991, Sikorsky reiterated that it "requires a qualified purchaser financially and technically capable of meeting the necessary regulatory requirements, as well as being a reliable source for product support and parts to <u>all</u> of the Skycrane operators."  Ex. 9 (emphasis in original).

During his deposition, Jack Erickson acknowledged that the proposal he originally made to Sikorsky specifically included a commitment to support the CH-54 after surplus.  Erickson Depo., pp. 35-38, 43, 67.  However, Erickson then sought to dismiss those statements as a mere "sales pitch."  <u>Id.</u>, pp. 37-38, 67.  Erickson insisted that, regardless of what he wrote in the letter to Sikorsky, EAC never intended to support military surplus CH-54s.  <u>Id.</u>, p. 68.  <u>But cf.</u> <u>id.</u> at 68-69 (asked "did you mean what you wrote or not," Erickson replied, "I don't know if I did or not.  Maybe, maybe not. . . .  I'll say yes and no.  At this point, I don't know.")

The parties have not directed the court's attention to any document in which, prior to signing the contract, EAC informed Sikorsky that EAC was refusing to support the CH-54 after surplus.  Nor have the parties directed the court's attention to any document in which Sikorsky consented to such a significant change of direction.  From all indications, the anticipated burden of supporting future surplus CH-54s, and Erickson's offer to assume that obligation, were primary inducements for Sikorsky to sell the Skycrane program to EAC.

During his deposition, Jack Erickson was asked:

Page 8 - OPINION AND ORDER

> Q: * * * * Before the February 11 agreement was executed, did you or anybody you're aware of at Erickson or one of Erickson's attorneys tell Sikorsky that Erickson was not interested in providing support for surplus owners of CH54 aircraft?
>
> A: They knew that.
>
> Q: How did they know that?
>
> A: I told them.
>
> Q: When did you tell them that?
>
> A: Probably before we signed this agreement. They knew that.
>
> Q: Well, give me a specific -- Did you have a specific conversation?
>
> A: Yeah. I remember it because we were talking about liability issues going forward with restricted category. And everyone was very concerned about restricted category because it's your own TC, you operate to different standards or whatever.
>
> And the conversation came about how Bell got into a big problem when all the Huey helicopters hit the surplus market after Vietnam. Bell came out and said, "Hey, we'll sell and support these things." And they opened up a can of worms. From lawsuits, guys operating totally on their own. Bell sold them parts. They got sucked into the liability issues of lawsuits and everything. Which, you know, maybe in some aspect Bell had nothing to do with it. But it was just kind of a good topic about how Bell made a big mistake by supporting an aircraft which they never intended, I don't think. It was a different airplane than their 204B, which was a commercial version.
>                          * * * *

Page 9 - OPINION AND ORDER

> Q: Was it your understanding that Sikorsky was interested in getting itself completely shy of the -- of the Skycranes, including both the 64 models and the 54 models?
>
> A: Yes.
>
> Q: And to whom did you -- Who did you talk to at Sikorsky about --
>
> A: I don't know who was there. It was over -- not a table like this. It was, you know, coffee conversation, during all the times I was there or whatever. I can't recall specifically. And it was not something we just sit and talked about. It was just all part of discussion.
>
> Q: So as a general discussion, the topic of liability came up?
>
> A: Liability come up, oh, yeah, that's right.
>
> Q: So there was a discussion about Bell and how --
>
> A: Yes, right.
>
> Q: -- Bell had walked into a pickle or can of worms or whatever?
>
> A: Yeah.
>
> Q: And you can't remember who -- who at Sikorsky was involved?
>
> A: No.
>
> Q: Are you aware of any written document that expressed that?
>
> A: I don't think -- No, no. It was just.....

Erickson Depo., pp. 90-93.

Erickson also testified that Roger Bougie and Gene Buckley were "the two primary guys" he "dealt with at Sikorsky in negotiating the purchase of the Skycrane." Id., p. 98. Bougie signed the contract for Sikorsky. Erickson doubts either man was present during the above conversation. Id., p. 99. The only person Erickson could identify who "probably" was present was Terry Vernes, whom Erickson had dealt with "from time to time." Id., pp. 98-99.

It is understandable that, after so many years, Mr. Erickson has limited recollection of these conversations. That is one reason courts are wary of relying on dim memories of distant conversations. The individuals who represented Sikorsky in the negotiations are unavailable to testify regarding their recollection of conversations, or understanding of what the parties had agreed. The most reliable evidence is usually the written record, particularly the language of the final contract, along with any documents exchanged among the participants, and the circumstances under which the contract was made.

Even accepting at face value Jack Erickson's testimony about the "coffee conversation"--the date of which is unknown but "probably" before the contract was signed, at which Terry Vernes "probably" was present (but not Sikorsky's principal negotiators or the individual who signed the contract for Sikorsky)--it has little probative value. There is no showing that the persons authorized to speak for Sikorsky on this issue responded. Nor have I seen any indication that Sikorsky agreed to waive its requirement that the buyer of the Skycrane program be "a reliable

Page 11 - OPINION AND ORDER

source for product support and parts to <u>all</u> of the Skycrane operators."  Ex. 9 (emphasis in original).[2]

On the contrary, Sikorksky's conduct immediately following execution of the contract[3] is consistent with a belief that EAC had promised to support the military surplus CH-54s.  For example, a letter dated March 9, 1992--less than a month after the contract was signed--memorializes a conversation between Art Smith of Sikorsky, and Jack Lenhardt of Lenair Corporation "concerning support for the S64/CH54 aircraft."  Lenair owned military surplus CH-54 aircraft at that time.  First Amended Witness Statement of Jack Erickson.  Smith "assure[d] [Lenhardt] that there is a provision within the contract covering third party support (such as yourself)."  Ex. 16.

A few days later, Smith wrote a second letter to Lenhardt:

> I contacted our litigation management and posed the questions you were asking about.  They have stated that per the provisions of the sales contract, Erickson is required by these provisions to provide support to anyone presently holding a type certificate, or anyone who applies for and is granted a type certificate by the F.A.A.

---

[2] On page 100 of his deposition, Erickson states "we agreed that we would support the National Guard as long as it had them in service."  Erickson does not say who "we" was, which individuals allegedly made such agreement, whether they were authorized to bind Sikorsky, how this agreement was objectively manifested, or when.  It is more of a conclusory statement.  Such agreement is not mentioned in Erickson's witness statement, which states only that supporting commercial S-64 operators and the National Guard was what EAC "intended."  In addition, a statement that EAC committed itself to support the National Guard does not preclude an obligation to other government or private entities.

[3] The conduct of the parties may be considered as an aid in interpreting the meaning of the contract.  <u>Ruscito v. F-Dyne Electronics Co.</u>, 177 Conn. 149, 170, 411 A.2d 1371, 1381 (1979).

Page 12 - OPINION AND ORDER

Ex. 17.

Operators of military surplus aircraft apply for and obtain type certificates from the FAA. From all outward appearances, Sikorsky believed the contract it had just signed with EAC required the latter to support military surplus CH-54s.

EAC refused to provide parts for Lenair's CH-54s.[4] Instead, EAC solicited orders for a proposed service for converting a CH-54 to an S-64:

> If adequate demand is demonstrated, Erickson Air-Crane Co. is contemplating offering substantial services to convert the CH-54 to the civil S-64 type configuration. At that time Erickson Air-Crane Co. will supply ongoing airworthiness and maintenance support. We would hope to be in a position to offer this service in the first quarter of 1993 * * * * Costing and commercial contracts will be developed, and we will be pleased to keep your company advised.

Ex. 642 (Letter from Richard Foy to Jack Lenhardt, July 23, 1992). Others who sought to obtain CH-54 parts from EAC received a similar response. EAC refused to sell parts to CH-54 operators unless they first purchased EAC's costly conversion service.

EAC eventually wrote to Sikorsky, and demanded Sikorsky stop telling CH-54 owners that EAC was obligated to support the CH-54. In that letter, EAC never denied it had promised to support the CH-54. Nor did EAC remind Sikorsky that the parties supposedly had agreed that EAC would be responsible only for aircraft in the military's possession.

---

[4] It is unclear whether Lenair was then in possession of a Restricted Category Type Certificate covering Lenair's CH-54s, but this does not affect my decision today.

Page 13 - OPINION AND ORDER

Instead, EAC argued only that "it is inappropriate for Sikorsky to tell any inquirer what obligation Erickson Air-Crane might or might not have, or Sikorsky's opinion of what Erickson Air-Crane ought to be doing in connection with the CH-54."  Ex. 25 (Letter from Neale Creamer to Sally Lord, Nov. 12, 1992). EAC's lawyer then warned, "I know that you seek to protect Sikorsky from liability and potential lawsuits, and that you want to keep Sikorsky as far away from the CH-54 as possible; your personnel giving advice or opinions involving the CH-54 is at least inconsistent with that goal." Id.

On January 15, 1993, Roger Bougie --a primary negotiator of the contract, and signatory for Sikorsky-- wrote to Jack Erickson.  Attached to the letter was a script Sikorsky would use when responding to third party inquiries by, among others, "Prospective Buyers of U.S. Government Surplus CH-54 A/B Aircraft."  The part relevant here states:

> Finally, Erickson also agreed to be the direct source for the re-supply of parts, components and accessories for the aircraft, and committed itself to providing such support and parts for the other owners and commercial operators of Skycranes.

Ex. 28, p. 6.

In the end, EAC has not pointed to language in the contract, or anything else in the record including the proposed witness statements and exhibits, that calls into doubt my prior conclusion that the 1992 contract requires EAC to support the CH-54.  Jack Erickson has admitted that the contract obligated EAC to support the CH-54, though he argued this obligation was

limited to aircraft while in the possession of the military. On its face, the contract contains no such limitation. I also have seen no admissible evidence that would permit a jury to conclude that Sikorsky and EAC mutually agreed upon such a limitation, but somehow neglected to say this in the signed contract.

EAC's submissions seem to assume that, in analyzing contractual rights and obligations, the emphasis is on the parties' internal thoughts and intentions. Under Connecticut law, "the intent of both parties to a contract determines whether a third party has contract rights as a third party beneficiary. Grigerik v. Sharpe, 247 Conn. 293, 310, 721 A.2d 526, 535 (1998).

However, when ascertaining intent for purposes of a contract, a court generally looks to the parties' objective manifestations, and the attendant circumstances, and not to any unexpressed private motives, intentions or reservations. See Ginsberg, 149 Conn. at 506, 182 A.2d at 6; Imperial Cas. and Indemnity Co. v. State, 246 Conn. 313, 327, 714 A.2d 1230, 1238 (1998) ("A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction").

My determination that EAC undertook an affirmative obligation to support CH-54 operators, including "subsequent purchasers of [the CH-54] as surplus military aircraft," effectively resolves the third party beneficiary issue. The CH-54 operators were more than mere "foreseeable" or "contemplated" third party beneficiaries. Cf. Grigerik, 247

Page 15 - OPINION AND ORDER

Conn. at 311, 721 A.2d at 536 (buyer of unimproved land lacked standing to assert third party beneficiary claim against engineer who had performed services for a prior owner of the land; the engineer undertook no direct obligation to the buyer). Nor were EAC and Sikorsky just allocating responsibilities and liabilities as between themselves. Cf. Pelletier v. Sordoni/Skanska Constr. Co., 264 Conn. 509, 531-32, 825 A.2d 72, 86 (2003) (injured employee was not intended third party beneficiary of contract between general contractor and subcontractor).

It is undisputed that Article II, §3(b)(3) of the contract, obligates EAC to support the CH-54. Erickson Depo., p. 69. EAC contends that obligation was limited to CH-54s possessed by certain third parties--variously characterized by Erickson as "the military" and the "National Guard." I have determined that this obligation also extended to subsequent purchasers of the CH-54 as surplus military aircraft.

Under either interpretation of the contract, Erickson undertook a direct obligation to one or more third party beneficiaries, Article XI, ¶ 4 of the 1992 contract notwithstanding.[5] The parties really are disputing only the identity of those third party beneficiaries.

---

[5] The court's reading of the contract does not render Article XI, ¶ 4, a nullity. The contract contains many provisions and promises between the contracting parties, to which that general disclaimer language may be given effect. In striving to give effect to the general disclaimer, it is essential to consider the contract as a whole, giving effect to all parts, lest the general clause negate specific promises made elsewhere in the contract or defeat the purposes of the contract. See Bialowans v. Minor, 209 Conn. 212, 217, 550 A.2d 637 (1988) (a contract must be construed as a whole, with all relevant provisions considered together).

Page 16 - OPINION AND ORDER

As a matter of law, HTS is a third party beneficiary of the 1992 contract, for the limited purpose of enforcing the obligation Erickson undertook to support the CH-54.

## Conclusion

Defendant's motion (docket # 156) to reconsider the order (# 153) regarding plaintiff's motion in limine (# 104) is granted. After considering the materials and arguments submitted by the parties, the court grants Plaintiff's motion (# 53) for partial summary judgment on the third party beneficiary issue.

IT IS SO ORDERED.

DATED this 4th day of February, 2008.

/s/ Owen M. Panner

_____
OWEN M. PANNER
UNITED STATES DISTRICT JUDGE